WILLIAM B. HIBBS, Appellant, *v.* ALEXANDER BROWN et al., Respondents.

1. JOINT STOCK ASSOCIATION — WHEN PURCHASER OF COUPON BOND ISSUED BY ASSOCIATION, AND STOLEN FROM THE OWNER, IS A BONA FIDE PURCHASER FOR VALUE.  The facts examined in an action to replevin three unpaid interest coupons originally attached to a bond issued by the Adams Express Company, a joint stock association, which bond had been stolen from the plaintiff and through intermediate transactions had been acquired by the defendants, and in which action the issues were whether the bonds and coupons were negotiable and whether they had been acquired in due course for value.  *Held,* that the defendants acquired possession of the bond and coupons in suit for value and under such circumstances as did not give them notice of or put them upon their inquiry against the outstanding rights of the plaintiff.

2. NEGOTIABILITY OF COUPONS NOT AFFECTED BY PROVISIONS IN TRUST DEED AS TO WAIVER OF DEFAULT IN AND POSTPONEMENT OF PAYMENT OF INTEREST.  Provisions of a trust deed, under which the bonds of the association were issued, purported to reserve to a certain proportion of the bondholders the right to waive default in and postpone payment of interest coupons, and it was contended that the coupons were thereby rendered non-negotiable, because such provisions prevented compliance with the requirements in negotiable instruments for an unconditional promise to pay on demand or at a fixed or definite time.  *Held,* that this was not so; that such provisions only related to and controlled procedure under the trust indenture itself for the purpose of enforcing payment of coupons, and did not for any other purposes work or permit a postponement of the time of payment of the coupons or prevent a bondholder from enforcing his ordinary and general remedies at law for the collection of such obligations.

3. WHEN BONDS ISSUED BY JOINT STOCK ASSOCIATION UPON ITS GENERAL CREDIT ARE NOT DEPRIVED OF NEGOTIABILITY BY EXEMPTION OF MEMBERS FROM PERSONAL LIABILITY — NEGOTIABLE INSTRUMENTS LAW, §§ 20, 22.  A clause in the trust deed securing payment of an issue of bonds

provided that "No present or future shareholder, officer, manager or trustee of the Express Company shall be personally liable as partner or otherwise in respect of this bond or the coupons appertaining thereto, but the same shall be payable solely out of the assets assigned and transferred to the said Trust Company or out of other assets of the Express Company," and it was contended that on account of the exemption of the individual members of the company from personal liability, the bond was not issued on the general credit of the association, but is payable out of a particular fund, to wit, its joint assets, and hence, under the Negotiable Instruments Law (L. 1897, ch. 612, §§ 20, 22), is non-negotiable and impresses this character upon the coupons. *Held*, that while a joint stock association differs from a corporation and is like a partnership in respect to the individual liability of its members, for the purposes of this case, the association issuing the bonds must be regarded as a joint, *quasi* corporate entity; that the bonds having been issued in its name, upon its general credit and binding all its assets, complies with the requirements for a negotiable instrument, even though the practically unimportant individual liability of members is excluded; that such exclusion does not constitute the general assets of the company out of which the bonds are concededly payable a particular fund within the meaning of the Negotiable Instruments Law.

The similarity of joint stock associations to corporations pointed out and discussed.

*Hibbs* v. *Brown*, 112 App. Div. 214, affirmed.

(Argued June 11, 1907; decided December 10, 1907.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered April 6, 1906, which reversed an order of the Appellate Term affirming a judgment in favor of plaintiff entered upon a decision of the Municipal Court of the city of New York and granted a new trial.

This is an action to replevy some coupons originally attached to a bond issued by the Adams Express Company and appellant's right to succeed turns on the question whether said bond and coupons were negotiable and acquired by respondents in due course for value. The controlling facts may be summarized as follows:

In January, 1902, the appellant owned a certain bond of the Adams Express Company to which were attached interest coupons for $20 each, then unmatured. The bond was stolen, and on April 23, 1902, with the coupons still attached

was presented by an unknown individual at the office of respondents who were conducting a brokerage business at Baltimore, Md., with a request that they buy it. This being declined such person then requested that they sell it for him and they thereupon wired Brown Brothers in New York to sell it, which was done on the floor of the Stock Exchange to brokers acting for an undisclosed principal, at the market price. Brown Brothers then notified the respondents that the sale had been made and the latter accepted the bond and coupons and paid the vendor thereof in cash the entire proceeds of the sale which they were to receive from Brown Brothers. The respondents then forwarded the bond and coupons to Brown Brothers in New York, and they were delivered through the brokers who purchased the same to Erico Brothers, the clients for whom they were purchased, and who it is conceded were innocent purchasers for full value before maturity.

The appellant did not discover the loss of the bond and coupons until July, 1902, and then he notified every bank and trust company in Washington and also the express company and the Mercantile Trust Company of New York, the trustee at whose office the coupons were payable, to stop payment of the latter and to identify any person presenting any of them for payment. Erico Brothers presented the coupons for September, 1902, and March, 1903, for payment and the same were paid notwithstanding the previous notice. In March, 1904, Erico Brothers also presented for payment to the trust company the coupons for September, 1903, and March, 1904, and payment was refused. They then through their brokers through whom they originally made the purchase, demanded of the brokers who had sold them for Brown Brothers that they take back the bond and unpaid coupons and refund the purchase price. Brown Brothers made a similar claim on the respondents, who, by purchasing and delivering another bond of the same issue, settled the claim and received back the bond and unpaid coupons. When the appellant ascertained these facts, he demanded the bond and coupons on the

ground that they had been stolen from him; and on defendants' refusal to deliver he brought this action to recover three of the coupons which had been detached from the bond.

The Adams Express Company, which, as before stated, issued the bond, is an unincorporated voluntary association or joint stock association organized under the laws of this state for the purpose of carrying on an express business, and having a president and other officers, and issuing certificates of stock which represent and whereby are transferred the rights of the respective shareholders.

The bond was issued by the express company in and under its association name, and was one of an issue of twelve millions of dollars, secured by a certain trust indenture conveying and pledging for its payment a large amount of securities and property. It bore interest coupons of the ordinary form payable to bearer, and, except for two clauses to be specifically referred to, may be assumed to have been in the usual form of a corporation negotiable bond payable to bearer or the registered holder. Of the clauses to be particularly noted, one which is especially important provides that "no person or future shareholder, officer, manager or trustee of the Express Company shall be personally liable as partner or otherwise in respect to this bond or the coupons pertaining thereto, but the same shall be payable solely out of the assets assigned and transferred to the said Trust Company or out of other assets of the Express Company." The other clause refers to the deed of trust for a statement of the rights of the bondholders and of the securities and property securing the payment of the bonds. Amongst the provisions of said trust indenture thus referred to and made controlling upon the bondholders are several relating to enforcement of the trust and collection of the bonds which are claimed to confer upon a certain proportion of the bondholders the right to waive default in and postpone payment of interest coupons.

*Herbert R. Limburg* for appellant. The bond and coupons are not negotiable, because they do not contain an **uncondi-**

tional promise to pay the amounts thereof, and are not drawn on the general credit of the maker. (*United Press* v. *Abell Co.*, 87 App. Div. 344; 25 Am. & Eng. Ency. of Law [2d ed.], 1130; *Munger* v. *Shannon*, 61 N. Y. 251; *Brill* v. *Tuttle*, 81 N. Y. 454; *Schmittler* v. *Simon*, 101 N. Y. 554; *Dawkes* v. *De Lorane*, 3 Wilson, 207; *Hamilton* v. *Myrick*, 3 Ark. 541; *Miller* v. *E. S. Co.*, 1 Ill. App. 273; *Smith* v. *Wood*, 1 N. J. Eq. 74; *H. G. M. Co.* v. *Hilton*, 124 Ala. 365; *Evertson* v. *Bank*, 66 N. Y. 14.) The bonds and coupons are not negotiable because of the provisions of articles 7, 9 and 11 of the trust deed. (*Kimball Co.* v. *Mellon*, 80 Wis. 133.) The coupons in suit are not negotiable instruments, because the right was reserved to the holders of a majority of the bonds to waive defaults in the payment of coupons. (*Bailey* v. *County of Buchanan*, 115 N. Y. 297; *W. S. Bank* v. *Town of Solon*, 136 N. Y. 465; *Cromwell* v. *County of Sac*, 96 U. S. 59; *City* v. *Lamson*, 9 Wall. 478; *I. & I. C. R. Co.* v. *Sprague*, 103 U. S. 756; *Dunsmore* v. *Duncan*, 57 N. Y. 573; *Evertson* v. *Nat. Bank*, 66 N. Y. 14; *Nesbit* v. *R. I. District*, 144 U. S. 610; *Roberts* v. *D., L. & G. R. Co.*, 46 Pac. Rep. 880.) The defendants are not holders in due course, nor have they derived any title from a holder in due course. (L. 1897, ch. 612, §§ 91, 98; 26 Am. & Eng. Ency. of Law [2d ed.], 1066, 1067; 1 Dos Passos on Stock Brokers [2d ed.], 424.)

*Scott McLanahan* and *George C. Austin* for respondents. The bond is a negotiable instrument. (*White* v. *V. & M. R. Co.*, 21 How. [U. S.] 575; Short on Railroad Bonds, §§ 49, 70; *C. Nat. Bank* v. *Faurot*, 149 N. Y. 532; *Mercer Co.* v. *Hackett*, 1 Wall. 83; *A. T. Co.* v. *C. W. Co.*, 72 App. Div. 539; *M. S. Inst.* v. *N. Y. N. E. Bank*, 170 N. Y. 58; *Evertson* v. *Nat. Bank*, 66 N. Y. 14; *Matter of Jones*, 172 N. Y. 575; *Waterbury* v. *M. U. E. Co.*, 50 Barb. 157; *Rice* v. *Rockfeller*, 134 N. Y. 174; *People* v. *Wemple*, 117 N. Y. 146; *People* v. *Coleman*, 133 N. Y. 279.) The question of the negotiability of the coupons is dependent solely upon a deter-

mination as to the negotiability or non-negotiability of the bond, and is not properly a subject of separate consideration, the coupons being mere incidents of the bonds. (1 Daniel on Neg. Inst. § 726; *Cromwell* v. *County of Sac*, 96 U. S. 59; *Miller* v. *Talcott*, 54 N. Y. 114; *N. Nat. Bank* v. *Kidder*, 106 N. Y. 221; *Eckhart* v. *Ellis*, 26 Hun, 663; *M. Groh's Sons Co.* v. *Schneider*, 34 Misc. Rep. 195; *Bailey* v. *Co. of Buchanan*, 115 N. Y. 297.) The coupons, even if regarded as separate instruments apart from the bond, are negotiable. (*Hollister* v. *Stewart*, 111 N. Y. 644; *Manning* v. *N. R. Co.*, 29 Fed. Rep. 838.) The defendants are in the position of holders of the bond and coupons in due course, having derived their title from a holder in due course. (L. 1897, ch. 612, §§ 96, 97; 2 Daniel on Neg. Inst. 1461, 1462.)

Hiscock, J. The appellant, as the true owner of the stolen coupons of which recovery is sought, in attempting to establish his rights of ownership against the respondents because of the character either of their possession or of the bond which they possess, bases his right to do this upon three propositions, any one of which being decided in his favor entitles him to succeed. These propositions are, *first*, that the respondents did not become the holders of his bond and coupons for value without notice of any defects; *second*, that whatever may be the character of the bond as to negotiability the coupons of which recovery is sought are independent instruments in the hands of respondents and non-negotiable and, therefore, subject to the assertion of appellant's rights, because of the clauses in the trust deed which, by enabling a certain proportion of the bondholders to waive defaults and postpone the time of payment of coupons prevent the latter from complying with the requirement in negotiable instruments for an unconditional promise to pay on demand or at a fixed and definite time; and, *third*, that on account of the exemption of the individual members of the Adams Express Company from personal liability, the bond is not issued upon the general credit of the association, but is payable out of a particular

fund, to wit, its joint assets, and hence is non-negotiable and impresses this character upon the coupons.

These propositions may be passed upon in the order stated. And since the members of this court are unanimous in their opinion that we should affirm the decision appealed from upon the first two propositions, I shall not discuss them, but shall limit myself to stating our conclusions thereon. As regards the first one, we feel entirely clear that respondents did acquire possession of the bond and coupons in suit for value and under such circumstances as did not give them notice of or put them upon their inquiry against the outstanding rights of appellant and that they are subject to no weakness of position in this respect.

As regards the second proposition, we think that a consideration of all of the provisions of the trust indenture demonstrates that the clauses relied upon to sustain this contention of appellant only relate to and control procedure under the trust indenture itself for the purpose of enforcing payment of coupons and do not for any other purposes work or permit a postponement of the time of payment of the coupons or prevent a bondholder from enforcing his ordinary and general remedies at law for the collection of such obligations.

And thus we come at once to the last proposition and to the interesting and important question upon which we differ, whether the bonds, of which the one here involved is one, were rendered non-negotiable because of the clause already quoted exempting members of the Adams Express Company from that personal liability thereon which would ordinarily attach to the individual members of a joint stock association.

I say important question, for certainly it will be an important and, as it seems to me, an unfortunate result if an obligor in that which by all of its prominent characteristics is a negotiable instrument can by inserting in some obscure manner a clause cutting off some utterly inconsequential liability secure not only such particular exemption, but what is vastly more harmful, make apparently negotiable securities in the hands of investors non-negotiable and seriously impair their value

and security. And it would be rash to assume that a decision effecting that result in this case would be limited to these bonds and that there would not be many other issues heretofore offered to and accepted by investors as negotiable which now on account of some trifling exemption or limitation would be stamped as non-negotiable with resulting impairment of character and value in the hands of the public.

We shall naturally and best start out with our inquiry by spreading before us as a guide and test the definition of negotiable instruments as now expressed in terms of statutory law so far as applicable to this question.

The Negotiable Instruments Law (L..1897, ch. 612), section 20, provides that "An instrument to be negotiable must conform to the following requirements :    *    *    *

" 2. Must contain an unconditional promise or order to pay a sum certain in money."

Section 22 of the same statute describes an unconditional promise to pay as follows : " An unqualified order or promise to pay is unconditional within the meaning of this act, though coupled with :

" 1. An indication of a particular fund out of which reimbursement is to be made, or a particular account to be indebted with the amount, or

" 2. A statement of the transaction which gives rise to the instrument.

" But an order or promise to pay out of a particular fund is not unconditional."

Section 22, defining an unconditional promise to pay, embodies the rules of the common law and law merchant as they had been established before the passage of any statute upon this point and we, therefore, briefly may turn to one or two earlier decisions as casting light upon the true interpretation and meaning of the statute which we have quoted.

In *Munger* v. *Shannon* (61 N. Y. 251) it was said : "A bill is an order drawn by one person on another to pay a third a certain sum of money absolutely and at all events. Under this definition the order cannot be paid out of a par-

ticular fund but must be drawn on the general credit of the drawer, though it is no objection when so drawn that a particular fund is specified from which the drawee may reimburse himself. * * * The true test would seem to be whether the drawee is confined to a particular fund or whether though a specified account is mentioned he would have the power to charge the bill up to the general account of the drawer if the designated fund should turn out to be insufficient. In the final analysis of each case it must appear that the alleged bill of exchange is drawn on the general credit of the drawer."

This case cited with approval the case of *Dawkes* v. *De Lorane* (3 Wils. 207) that "the instrument or writing which constitutes a good bill of exchange is not confined to any certain form or set of words, yet it must have some essential qualities, without which it is no bill of exchange; it must carry with it a personal and certain credit given to the drawer, not confined to credit upon any thing or fund; it is upon the credit of the person's hand, as on the hand of the drawer, the indorser, or the person who negotiates it; he to whom such bill is made payable or indorsed, takes it upon no particular event or contingency, except the failure of the general personal credit of the persons drawing or negotiating the same."

It is not claimed that payment of these bonds is limited to the property pledged as security therefor with the trustee, but it is admitted that they may be collected from any and all of the general assets and property of the express company. The only respect in which they are claimed to come in conflict with the prohibition against a negotiable instrument being payable "out of a particular fund," is because of the provision that they may not be collected from the individual property of the members of the association. This subtraction, it is said, makes the remaining property from which they be collected a "particular fund."

The decisions which I have quoted state the rule that a negotiable instrument may not be made payable out of a particular fund as the equivalent of the one that it must be

" drawn on the general credit of the drawer," and so if we fairly can say that, notwithstanding the exemption, the maker of the bonds did pledge its general credit, then it will follow that there has not been that limitation of promise of payment to a particular fund which is prohibited by the statute.

Was the general credit of the obligor pledged ?

The Adams Express Company was the maker of the bonds. They were issued by it in its artificial, corporate-appearing name, under its common seal, by its authorized executive officers and for its benefit. They expressed the general promise and obligation of the company which thus issued them, and were a claim against it upon which, as we shall see hereafter, judgment might be obtained or a receiver be appointed of it, and satisfaction obtained out of any or all of its joint, business, well-understood assets and property, and which we know aggregated many millions of dollars. Payment was not limited to the pledged securities or to any other part or parcel of the property of the association which made the bonds, but was a charge against the whole thereof. Thus far, therefore, they were entirely similar to the familiar bonds issued by an ordinary corporation which are general claims against it, and which are concededly negotiable. But here it is that we come against the contention that this view of the character of the bonds however practical and desirable cannot prevail ; that the exemption of the personal liability of the individual members of the association after all works a limitation upon the pledging of the general credit of the company which issued the bonds, and turns all of its assets, from which their payment may be enforced, into a special, limited fund.

As the foundation for this contention much care has been devoted to pointing out the difference between a joint stock association and a corporation, and to emphasizing the fact that the former is in effect a partnership, and that the individual liability of its members is just as essential a characteristic as it is in the case of a partnership, and that, therefore, it may not be eliminated without materially affecting the contract of the association.

Of course there can be no doubt that a joint stock association differs from a corporation, or that in its original conception and ultimate analysis it is like a partnership in respect to the individual liability of its members. But, upon the other hand, so many of the attributes and characteristics of a corporation have been impressed upon the modern joint stock association that in my opinion, for the purposes of the question now before us, we are amply justified in regarding simply the joint, *quasi* corporate, entity, and in saying that an obligation issued in its name upon its general credit, and binding all of its assets, complies with the requirements for a negotiable instrument, even though the practically unimportant individual liability of members is excluded.

We may briefly refer to some of these characteristics which, as I think, have led both courts and laymen to regard joint stock associations largely as corporate creations, and in ordinary business dealings quite to ignore the feature of individual membership and liability, even though it does exist. They are, like corporations, organized under and regulated by statutes (Laws 1894, chapter 235). They have, and transact business under, an artificial name. Their capital and ownership is represented by shares of stock transferable at will, and their existence is not dissolved or affected by the death of or transfer of interest by members. They have regular officers in whose names actions may be commenced in behalf of and against the association, and upon a judgment rendered in the latter case, execution may be issued only against property belonging to the association or to all of its members jointly. Formerly action could not be brought against the individual members of the association until after judgment and execution unsatisfied against the association. Now, although an action may be brought in the first instance against the members, still if the claimant elects to bring suit against the association he must then as formerly proceed to judgment and execution unsatisfied before instituting other suit against the members. And, as illustrating the complete and separate existence of the association as between it and the

individual members, suit may be brought by it against such members. (Code, §§ 1919–1924.)

Based upon such statutory provisions decisions have been made and opinions written emphasizing their corporate character as distinguished from the ordinary partnership wherein the individual relationship and liability of the members is universally recognized and of importance.

In *Waterbury* v. *Merchants' Union Express Co.* (50 Barb. 157), a case often cited, it was held that a receiver might be appointed of one of them, and it was said with reference to the powers conferred upon them by various statutes : " These, are all attributes of a corporation, and if we look into the books for elementary definitions we shall find that corporations have no other attributes except the technical one of a common seal to distinguish them from common law partnership. On the other hand, simple partnerships have none of the attributes or qualities here mentioned. * * * Looking at the substance and nature of things it is plain that in respect to the absence of a common seal merely these joint stock associations are like partnerships. In the other and vastly more, material respects mentioned they are like corporations, although they are not declared to be such by the legislative acts referred to."

In *Matter of Jones* (172 N. Y. 575) it was held that shares in a joint stock association constituted personal property and were subject to the transfer tax irrespective of the character of the property represented thereby, whether real or personal. The court quoted with approval the statement in Beach in his work on *Private Corporations* (Vol. 1, § 167) that " The powers conferred upon them by these enactments are such that for many purposes they are held to be corporations, even though they have nowhere been designated as such."

In *People ex rel. Platt* v. *Wemple* (117 N. Y. 136) it was held that the franchise or business of the United States Express Company, a joint stock association, was subject to taxation under certain statutes invoked for that purpose. The court, after referring to the powers and characteristics

of the company not unlike those possessed by the Adams Express Company, says: " It seems obvious from these articles, that the arrangement consummated by them has little in common with a private partnership, for they provide for a permanent investment of capital, the right of succession, the transfer of property by an assignment of the certificate of ownership, and the prosecution of suits in the name of one person. The company has, therefore, the characteristics of a corporation, and, so far as it can, it assumes to itself an independent personality and asserts powers and claims privileges not possessed by individuals or partnerships."

In *People ex rel. Winchester* v. *Coleman* (133 N. Y. 279), which was a proceeding by certiorari to review the action of taxing officials in imposing an assessment upon the capital stock of the National Express Company, a joint stock association, it was said : " It is then asserted that a series of statutes, beginning with the act of 1849, has ended in the gift to joint stock associations of every essential attribute possessed by and characteristic of corporations * * *; that the lines of distinction between the two, however far apart in the beginning, have steadily converged until they have melted into each other and become identical ; that every distinguishing mark and characteristic has been obliterated and no reason remains why joint stock associations should not be in all respects treated and regarded as corporations. Some of this contention is true. The case of *People ex rel. Platt* v. *Wemple* (117 N. Y. 136) shows very forcibly how almost the full measure of corporate attributes has, by legislative enactment, been bestowed upon joint stock associations until the difference, if there be one, is obscure, elusive and difficult to see and describe. * * * The two are alike, but not the same. More or less, they crowd upon and overlap each other, but without losing their identity, and so, while we cannot say that the joint stock association is a corporation, we can say as we did in *Van Aernam* v. *Bleistein* (102 N. Y. 360), that a joint stock company is a partnership with some of the powers of a corporation."

In *Oliver* v. *Liverpool, etc., Fire Ins. Co.* (100 Mass. 531) it was held that an English joint stock association was sub- ject to a tax assessable against "each fire * * * insur- ance company incorporated or associated under the laws of any government or state other than one of the United States." While there may be some slight difference between such a joint stock association and one existing under the laws of this state, what was said by the court is applicable to either. This statement was that " ' Joint stock companies are not pure partnerships, for their members are recognized as an aggre- gate body ; nor are they pure corporations, for their members are more or less liable to contribute to the debts of the col- lective whole. They are associations of persons intermediate between corporations known to the common law and ordinary partnerships, and partake of the nature of both.' * * * And we are all of opinion that when, by legislative authority or sanction, an association is formed capable of acting inde- pendently of the rules and principles that govern a simple partnership, it is so far clothed with corporate power that it may be treated for the purposes of taxation as an artificial body."

In *State ex rel. R. & W. Comm.* v. *Adams Express Co.* (66 Minn. 271) it was held that the present joint stock association was so similar in many of its features to a corporation that it would be subject to the provisions of a statute providing for service of process upon a corporation.

Now while it is true that these statutes conferring upon joint stock associations the attributes of corporations, and the opinions discussing the similitude of the former to the latter do not destroy the element of individual liability, they do irresistibly force upon us appreciation of the fact that a great association like the Adams Express Company is very unlike an ordinary copartnership and that it has assumed for ordi- nary, practical purposes in its business and contractual relations the features and characteristics of a corporate creation, whereby the joint aggregate entity has been made prominent, and the individual units composing it have been overshad-

owed and obscured. Amongst other things, as we have seen, this organization in its aggregate capacity and under its artificial name which bears no relation to the identity of its members, may not only hold property, transact business and make contracts, but what is especially pertinent in this controversy those contracts may be enforced by proceedings against it which are entirely independent of any liability of individual members. In short, I do not think that we should transgress any proper limits, if we assumed that the public in dealing with the present bonds did so solely upon the faith and credit of the association, the entity which issued them, and without knowledge or thought of the individuals who composed it or their financial responsibility.

Under such circumstances we ought not to sacrifice substance to form and destroy the negotiable character of the bonds because of the exemption of individual liability unless we are compelled to, either by some controlling principle or authority, and, as I believe, there is neither which commands such a course.

The rule defining the requisites of negotiable instruments though now embodied in a statute is subject to a reasonable interpretation and construction. While we may not disregard the requirement that such an instrument must not be limited for payment to a particular fund, we may say what facts satisfy this requirement. We cannot, of course, override the terms of a statute when finally interpreted. But we can refrain from giving to those provisions too literal or impractical an interpretation which will work unexpected and undesirable results. We must accept the full test laid down at the commencement, that these bonds must not be made payable out of a particular fund or be issued otherwise than upon the general credit of the maker. But upon the proofs presented in my judgment we are not compelled to say that they are not general charges against the obligor which issued them as fairly and practically created, regulated and regarded, or that being a claim against all of its assets they are payable out of a particular fund. I think that the authorities which have been

cited to sustain the contention that they are vulnerable in these respects, not only do not do so, but that a careful consideration of them and of other authorities in the light of the facts under consideration in each case, discloses that none of them has held an instrument to be payable out of a particular fund and hence non-negotiable upon any such proofs as appear here. In every case it will be seen that the instrument which was condemned was simply an order upon or assignment of some specific, limited fund or interest and carried no general liability of the drawer which made it a charge against his general credit and all of his assets. Under such circumstances it was held to be an assignment *pro tanto* and, of course, as an assignment it was not negotiable.

It will not be possible to review any considerable proportion. of the cases which have passed upon this question and, in fact, this is unnecessary, for a few of those decided by this court will sufficiently indicate the circumstances under which an instrument has been regarded as drawn upon a special fund and, therefore, a *quasi* assignment and not negotiable.

In *Lowery* v. *Steward* (25 N. Y. 239) the order read : " Please pay to the order of Archibald H. Lowery the sum of five hundred 00/100 dollars on account of 24 bales of cotton shipped to you, as per · bill of lading, by steamer *Colorado*, inclosed to you in letter."

In *Parker* v. *City of Syracuse* (31 N. Y. 376) the order was drawn upon the comptroller of the city in the following terms : " Pay Parker & Wright fourteen hundred and twenty dollars, on plank road and sidewalk accounts and charge to my account. A. L. Scofield."

In *Alger* v. *Scott* (54 N. Y. 14) the order was drawn by a landlord upon his tenant, reading : " Please pay Mr. John R. Glover $346.69, and charge same to me, account of rent of house No. 13 Cheever Place."

In *Brill* v. *Tuttle* (81 N. Y. 454) an order was given by defendant to plaintiffs reading as follows :

" Pay Brill & Russell three hundred dollars and charge the same to our account for labor and materials performed and

furnished in the repairs and alterations of the house in which you reside, in the village of Mohawk."

In *Ehrichs* v. *De Mill* (75 N. Y. 370) the language of the instrument was: " Please pay to F. Erichs $400 and charge the same to my account of grading and paving Lexington Avenue   *   *   *   as per contract."

It seems as if no extended comment upon these cases were necessary to point out how widely they differ from the one at bar; how clearly each instrument mentioned in them is an order upon, an assignment *pro tanto* of, a limited fund without any general credit or liability behind it, and how unnatural it would be upon the other hand to say that the present obligations, charges against the general, joint credit of the drawer which issued them and enforcible out of its assets, are orders upon or assignments in any sense of a particular fund even though an individual liability which is practically and equitably a secondary one has been cut off.

Some minor reasons of a somewhat technical nature are urged in support of the claim of non-negotiability. It is said that section 1919 of the Code of Civil Procedure provides that an action may be maintained against the officials of a joint stock association to recover upon any cause of action upon which the plaintiff might maintain an action against all of the associates and it is then suggested that if the holder of one of these bonds cannot bring an action against the individual members of the association, he cannot under said section bring an action against the association itself through its officers ; that while an action in equity perhaps might be maintained to reach the pledged securities, no action at law can be maintained upon the bonds, and this being so, they are not negotiable. I do not regard these objections as well founded.

The section referred to is one of several prescribing the procedure by which an action may be brought against the association, as distinguished from its individual members, and the property of the association be reached. The section especially quoted is intended to define the nature and kind of actions which may be so brought, and this it does in general

terms by defining them as all which might be brought against the individual members.

These bonds ordinarily, and except for special provision, would constitute a claim upon which might be maintained an action against the associates, and this circumstance stamps the cause of action as one which may be prosecuted against the association. It would be somewhat extraordinary to construe the section as meaning that the character and standing of the claim being thus fixed, the association might then debar the holder from bringing such an action against it by an agreement which it had procured him to make to waive the individual liability, which otherwise might be enforced, and to bring his action against the association. Of course if this agreement has not produced this result, there is no foundation for the further idea that no action at law can be maintained upon the bonds. If the holder of them has not barred himself from so doing by waiving the individual liability he may, as we have already seen, bring an action at law against the association, which is entirely independent of, and in fact temporarily at least, a bar to an action against the individuals.

The order appealed from should be affirmed and judgment absolute rendered against appellant upon his stipulation, with costs.

O'Brien, J. The only question in this case is whether the coupons which are the subject-matter of the action are upon their face negotiable instruments. I think they are, and my reasons for this conclusion stated as briefly as may be are these: It is admitted that the coupons are a part of and impressed with the same legal character as the bonds themselves from which they were detached. If the bonds are negotiable so are the coupons. I do not understand that it is seriously claimed that the fact that a fund was set apart and conveyed to a trustee to assure the payment of the bonds as they fell due affected the legal character of these obligations as negotiable instruments so long as the holders were not con-

fined or limited to that fund for payment. It is, I assume, a very common practice in the modern business world to set aside a fund or to provide for the creation of a sinking fund for the ultimate payment or redemption of bonds, but it was never supposed that this fact would affect their negotiable character. The very purpose of such financial arrangements is to give greater assurance of payment to those who purchase the bonds in the market by adding to their value and credit. The fund is a protection to the holders of the bonds and in some cases to others who may become liable for their payment in whole or in part. In this case not only the fund set apart, but all the other assets of the company as well, were pledged for the payment of the bonds, and, hence, the fund only added to their credit and financial value without affecting in the least their negotiable character.

The only question in the case as to which there is any serious dispute is, as I conceive, whether the clause on the face of the bonds which provides that "no present or future shareholder, officer, manager or trustee of the Express Company shall be personally liable as partner or otherwise in respect of these bonds or the coupons appertaining thereto" deprives them of the character of negotiable paper. The contention of the plaintiff is that this clause destroys the negotiable quality of the bonds though payable to the bearer or holder. This clause contains also the statement that the bonds "shall be paid solely out of the assets assigned and transferred to the said trust company or out of the other assets of the Express Company." So that all the property of the company issuing the bonds was and is available to the holders as the source of payment and satisfaction thereof. I do not think that the obligations of a joint stock company payable to bearer are rendered non-negotiable from the fact that the paper upon its face contains a clause which exempts the shareholders and officers from liability so long as the general assets of the company are pledged for payment. But this is the disputed question in the case, and the contrary view is supported by an argument which rests mainly, if not

entirely, upon the proposition that joint stock associations are partnerships, and that the obligations in question are the obligations of the individual shareholders, and that they are liable upon them, jointly and severally, the same as partners. Stating the argument in another way it comes to this: The bonds in this case are the bonds of a partnership, made in the name of the firm, and though containing a promise to pay the bearer or holder a specified sum of money in the future, upon a day certain, yet the promise is coupled with a condition that none of the partners shall ever be held liable. If the premises upon which the argument is based are correct, it would, I admit, be difficult to resist the conclusion, unless, indeed, it could be held that the conditions might be rejected as utterly inconsistent with and repugnant to the promise and, therefore, void. Adopting the theory that the bonds are the obligations of the shareholders as partners, the repugnancy is quite obvious. But I do not think that the bonds in question are in any proper or legal sense partnership obligations made by the shareholders as partners. Primarily the promise to pay the bearer or holder is not the promise of the shareholders, but of the legal entity represented by the express company as such.

A joint stock company, whatever else may be said about it, is certainly for most, if not all practical purposes, a legal entity, capable in law of acting and assuming legal obligations quite independent of the shareholders. The idea that these companies occupy some undefined and undefinable ground midway between a partnership and a corporation has practically faded away and cannot be applied to the question with which we are now concerned. It is not very important to inquire what they were in their origin, but rather what they are now, or at least were when the bonds in question were issued and sold to the public. It seems to be conceded or assumed that if the express company, at the time of issuing the bonds, had been incorporated by filing the usual certificate for that purpose, the clause exempting the shareholders from liability would not affect their negotiable character. It

remains only to consider what sound distinction, if any, can be made between the twelve millions of bonds issued by the express company and the other untold millions of other bonds issued by corporations. They are all negotiable in form, that is to say, payable to order or bearer, as the case may be. Assuming that the shareholders of a corporation are or may be liable for the corporate debts, and that the clause referred to would not affect the negotiable quality of its paper, what reason is there for holding that the clause destroys the negotiable quality of the bonds in question ? The proposition that in the one case the bonds import a promise to pay by a corporate body and in the other the promise of individuals as partners or as a partnership firm, does not seem to me to be reasonable or tenable. The argument in support of that theory would seem to be somewhat strained. The general rules of law that govern partnerships have very little application to joint stock companies, at least so far as concerns the question now under consideration. The principle of agency which enables one partner to bind all his associates as well as the firm has no application to such companies. The death of one or more of the members of the company does not work a dissolution. The doctrine of survivorship, so important as between partners, does not exist as to such companies, and so it would be difficult to state a single general rule of partnership law that in its full extent could be applied to such companies. On the other hand, there are very few of the legal principles that apply to corporations that do not apply in some form to these companies. They are taxed and perpetuated through the shares of stock as corporations are. They are entitled to assume an artificial name, to sue and are subject to be sued. They may use a common seal and through the shares of stock they have perpetual life even in a larger sense than corporations have. Their general powers and duties to the public are practically the same and regulated in the same way as corporations. I need not pursue the comparison any further, nor enlarge upon it, since the learned opinion of my associate, Judge HISCOCK, who has referred to the various judicial

views on the subject, pro and con, fully covers that feature of the case.

It is very true that the shareholders of such companies are liable ultimately for the company's obligations, but that does not make such companies partnerships in the sense that their obligations are the contracts or promises of the shareholders. The shareholders of corporations are or may be liable in the same way, but such liability is not, of course, that of partners. The statutes of this state prescribing the method of procedure in suits by and against joint stock companies (Code Civ. Proc. §§ 1919 to 1924) do not qualify what has been stated concerning the legal nature of such companies. They embody the distinct idea that the liability of the shareholders is not primary, but secondary, the same as in case of corporations; and even if these statutes had never been enacted it is quite likely that the Adams Express Company could, in that artificial name, sue and be sued in the same manner as a corporation, since the State Constitution (Art. 8, § 3), while enacting that corporations have the right to sue and are subject to be sued the same as natural persons, defines joint stock companies having any of the powers and privileges not possessed by individuals or partnerships as corporations within the meaning of that section. The main purpose of these provisions of the Code would seem to be the enactment of a mode of procedure which would enable creditors of the company, or parties having a cause of action against it, to exhaust all legal remedies against the company as a legal entity before resorting to the personal liability of the shareholders analogous to similar rules applicable to corporations. It is, I think, very difficult to avoid the conclusion that these companies at this day and in this state possess substantially and practically all the attributes of corporations, and still more difficult to assign any sound reason for any distinction to be made between the negotiable character of the bonds of each when made payable to bearer. These companies are for all practical purposes *quasi* corporations, and it seems to me are clearly such so far as concerns the negotiable character of its commercial paper

or promise to pay a specific sum of money to bearer upon a day certain.

If the bonds in their present form had been stolen from the Adams Express Company by one of its clerks or employees, or even a stranger, and they had been put in circulation and passed from hand to hand to the possession of an innocent holder who had purchased them in the market in good faith and for value, and the company had brought suit against him to recover the stolen property, as the plaintiff in this case has, we would then have the same question before us that we have now. It may be safely asserted that under such circumstances the company would and ought to fail in the action, and that it would not be permitted to impeach the holder's title to the paper by the fact that upon its face there was a condition discharging the shareholders from liability, and, hence, were not negotiable instruments. When the important powers and functions which these companies possess and exercise in the business and commercial world are considered, the close analogy between corporations and joint stock companies is made still more evident. They are not only common carriers of property with world wide connections and ramifications, but deal in money credits and exchanges in practically the same way as banks. They purchase and deliver goods upon the order of local customers in all parts of the country and even in foreign countries. They have issued millions of securities in the form of bonds payable to bearer that have been sold to the public. It seems to me that it would be at least unwise to discredit these securities by holding that in consequence of the exemption clause as to the shareholders' liability the bonds are mere contracts to pay without the quality of negotiability. Such a result, I think, would not be sanctioned by sound policy or sound law and would be contrary to the intention of every one connected with the transaction either as maker or buyer, since it cannot be supposed that a business man of any sense would have offered to sell in the market, and much less to buy, a partnership obligation payable to bearer with a condition clause

upon its face releasing all the partners from any obligation to pay it.

So far as concerns the question involved in this appeal, the bonds, I think, are not the bonds of the several members of the company as partners, but of a legal entity as such, with an artificial name analogous to a corporation, and they possess all the qualities of corporate bonds payable to bearer. It is quite obvious that in respect to the negotiable quality of the bonds they must be considered and treated in law either as partnership or as corporate obligations. There is no middle ground upon which to rest. The argument that the promise to pay is that of a partnership does not seem to me to be supported by any conclusive reasons, and if adopted might destroy a large class of securities held by innocent investors. The general rule, which I fully recognize, no doubt is that in order to give to commercial paper, whether in the form of bonds or promissory notes, the quality of negotiability, and the legal rights which appertain to such instruments, the promise to pay must be unconditional and all the assets of the promisor or maker must be pledged to make good the promise according to its terms. The bonds in question, in my opinion, comply with that rule, unless it can be held that the liability of the shareholders of the company can be called assets within the meaning of the rule and I think it cannot. The assets of the express company, the maker of the bonds in question, consisted of its actual, tangible property over which it had full power of disposition, dominion and control, and not the liability which the law imposes upon shareholders for the company debts in certain cases and upon certain contingencies. There is no reason that I can perceive for denying to a *bona fide* holder of one of these bonds any means of defending his title when attacked that the law gives to a like holder of the negotiable paper of an individual or corporation.

I think that the order appealed from is right and should be affirmed, with costs.

EDWARD T. BARTLETT, J. I concur in the result reached by Judge WERNER's opinion. I also agree in the main with the grounds stated therein. I am, however, unable to agree with the suggestion that it is unnecessary to treat the exemption clause as nugatory, as a matter of public policy. I am of opinion that the personal liability from which the company has sought to absolve its shareholders, officers, managers and trustees is primary in its character and beyond the power of the company to interfere with it in any way; to hold otherwise would be subversive of the law of joint stock associations and permit them to exercise corporate powers and privileges without legislative sanction or restraint. Declaring legal this attempt to release shareholders and officers from personal liability would result in untold complications and financial disaster. One result would be to deprive creditors of their main security in many instances.

The visible assets of an express company, as compared with its bonded and other indebtedness, are in many instances insignificant and of little value. Its business is to deliver packages, parcels and other light personal property to all parts of the country. Transportation is mainly secured under contracts with the railroad companies. In cities and villages its principal property consists of office fixtures, horses, wagons, harness, etc., realizing little at forced sale. In other words, the express company does not require an expensive plant as do manufacturing and other kinds of business. These are persuasive reasons why, as matter of public policy, the personal liability of members of joint stock associations should remain unimpaired so long as business is conducted in that manner.

At the present time, in this state, there are four methods by which a man may carry on business: He may proceed as an individual; associate himself as a partner in a firm; become a member of a joint stock association; assume the responsibilities and enjoy the privileges of a stockholder in a corporation. The members of joint stock associations enjoy certain benefits and rest under well-defined burdens. The

case at bar presents an excellent illustration : Certain individuals, banded together in a great business enterprise, have listed bonds to the extent of $12,000,000 on the New York Stock Exchange. In other words, they have exercised powers usually vested in corporations. The law permits this for the reason that they are copartners resting under personal liability, joint and several, for all the debts and obligations of the company, and hold themselves out to the world as such.

I am of opinion that public policy requires that all partnerships taking the form of joint stock associations should rest under the common-law liability of partners so long as they choose to avail themselves of the great privileges and protection inherent to such a mode of transacting business. The joint stock association is not of statutory origin, as is the corporation, but the creature of the common law ; by recent legislation it is required to annually file its written certificate, signed and verified by the president and treasurer, containing certain facts. (2 R. S. [Banks' 9th ed.] p. 1471.) The Code of Civil Procedure (§§ 1919 to 1924) has regulated actions by and against unincorporated associations to some extent. It is unnecessary to point out in detail the very great difference between the joint stock association and a corporation. The association has not appealed to the sovereignty of the state for its right to exist, and is, therefore, free from the visitorial powers to which corporations are subjected ; nor is it amenable to those various commands of the statute which if disobeyed lead to the imposition of certain liabilities and penalties. The association need not disclose the amount of its capital, or the number of its shares ; the corporation is obliged to do so. It is the obvious policy of the state to maintain this distinction, to wit : If men desire to embark in great business ventures, practically exempt from governmental control, they must do so subject to the joint and several liability to pay the debts thereby incurred. If they wish to be freed from that liability they can secure the same result by forming a corporation and submitting to governmental visitation and control and to various statutory restraints by virtue of which the rights of creditors

are protected. Public policy clearly requires that such vast transactions shall be carried on either under corporate restraint or the rigorous common-law rule of joint and several liability for debts. The distinguishing feature of the joint stock association is the personal liability of its members. (*Van Aernam* v. *Bleistein*, 102 N. Y. 360; *People ex rel. Winchester* v. *Coleman*, 133 N. Y. 279; *Matter of Jones*, 172 N. Y. 575, and cases cited in above authorities.)

I am in favor of declaring that a sound public policy dictates that this feature of personal liability is co-existent with the life of the association and cannot be abrogated by the contract of the parties in interest.

It follows that the clause in the bonds of the Adams Express Company seeking to release the members thereof from personal liability is void and the bonds and coupons are negotiable instruments.

The order appealed from should be affirmed, and judgment absolute in favor of the defendants and against plaintiff on his stipulation should be entered, with costs.

CULLEN, Ch. J. I agree with the opinion of Judge WERNER that if the clause in the bonds in controversy here relieving the shareholders from personal liability were effective, it would render the bonds non-negotiable and lead to a reversal of the order below. But I also agree with him that such exemption clause is repugnant to the general tenor of the bonds which are intended to be negotiable and which have been purchased by the public as such and, therefore, should be eliminated and disregarded. Still further, I agree with the opinion of Judge EDWARD T. BARTLETT that any provision in the contract of a joint stock association relieving the shareholders from liability is contrary to public policy and void, since it would enable the shareholders of such associations to obtain all the immunities of stockholders in a corporation without incorporating and subjecting themselves to the restrictions and regulations imposed by law on corporations.

13

WERNER, J. Although I concur in the result of the decision about to be made, I cannot yield assent to the reasoning upon which it is based. The vital question in this case is whether the bonds from which the coupons in suit were clipped are negotiable instruments or not, and that depends upon several considerations which I will briefly discuss.

These bonds are part of an issue of $12,000,000 made by the Adams Express Company, which is a joint stock association, each of whose shareholders is, by the terms of its articles of association and the general law, individually liable for the debts of the company incurred in the transaction of its business. The bonds are made in the name of the company, are payable to bearer, and contain many if not all the stipulations and conditions that are usually found in corporate bonds such as are now concededly in the category of negotiable instruments. (*Mercer County* v. *Hacket*, 1 Wall. 83, and cases there cited.) These bonds also contain another clause that is not to be found in corporate bonds. They recite that, "No present or future shareholder, officer, manager or trustee of the express company shall be personally liable as partner or otherwise in respect of this bond or the coupons appertaining thereto, but the same shall be payable solely out of the assets assigned and transferred to the said trust company (the trustee named in the trust deed), or out of the other assets of the express company." As this clause is in direct conflict with the general provisions of the law and the express company's articles of association respecting the individual liability of the shareholders of the company, the real question in the case is whether the particular clause is a valid and essential part of the bonds, or whether it can be eliminated as repugnant to the general tenor and purpose of the instruments in which it is found. If the clause is valid there can scarcely be any logical escape from the conclusion that the bonds are rendered non-negotiable. If, however, the particular clause can be discarded as void, that will eliminate the only difference of substance between these bonds and other bonds which, by common consent, are classed as negotiable instruments.

The reason why the last quoted clause of the bonds, if valid, is inconsistent with their negotiability is that they are the obligations of a joint stock association as distinguished from a corporation, and the stipulation absolving the shareholders of the company from individual liability is a distinct limitation upon the credit which is pledged in the making of the instrument. One of the cardinal qualities of a negotiable instrument is that it must pledge the general credit of the maker. This was one of the universally recognized rules of the law merchant as declared in the English decisions (*Dawkes* v. *De Lorane*, 3 Wils. 207 ; *In re Boyse*, L. R. [33 Ch. Div.] 612 ; *Bank of England* v. *Vagliano*, L. R. [App. Cas. 1891] 107–145 ; *M'Lean* v. *Clydesdale Co.*, L. R. [9 App. Cas.] 95) ; and in the decisions of this state. (*Munger* v. *Shannon*, 61 N. Y. 251 ; *Brill* v. *Tuttle*, 81 N. Y. 454 ; *Schmittler* v. *Simon*, 101 N. Y. 554.) That rule as now tersely stated in our Negotiable Instruments Law may be paraphrased as follows : " An instrument to be negotiable  *  *  * must contain an unconditional promise or order to pay a sum certain in money " (Subd. 2, sec. 20), " but an order or promise to pay out of a particular fund is not unconditional." (Subd. 2, sec. 22.) The cases referred to, as well as the statute, make it entirely clear that the mere indication of a particular fund from which the maker of an instrument may reimburse himself, or a mere reference to a specified account which is to be debited with the amount called for by the instrument, does not affect its unconditionality, and it is only where the order or promise is to pay out of a particular fund that it is considered conditional in such sense as to destroy the negotiability of the instrument.

The bonds of this issue are payable solely out of the assets assigned and transferred to the trustee or out of the other assets of the express company. If the express company were a corporation this would clearly be an unconditional promise for it would be a general pledge of the credit of the maker ; a tender of all it had to give in satisfaction of the debt. But the company is concededly not a corporation,

although our statutes have invested it with certain corporate attributes. It is unnecessary to enumerate these since it cannot be disputed that in respect of the individual liability of the shareholders of a joint stock company for the company debts, the common-law rule still obtains. Each shareholder is liable precisely as though he were a member of an unlimited partnership. (*Townsend* v. *Goewey,* 19 Wend. 424; *Dennis* v. *Kennedy,* 19 Barb. 517; *Wells* v. *Gates,* 18 id. 554; *Cross* v. *Jackson,* 5 Hill, 478.) Although, as we have stated, joint stock companies have been granted certain privileges and immunities peculiar to corporations, this most distinctive difference between these corporate and non-corporate creatures of the law has been consistently preserved by the legislature and recognized by the courts. (Code Civ. Pro. secs. 1919–1924; *People ex rel. Winchester* v. *Coleman,* 133 N. Y. 279; *Van Aernam* v. *Bleistein,* 102 N. Y. 360; *Matter of Jones,* 172 N. Y. 575.)

From what has been said it must follow that if the clause in the bonds exempting the individual shareholders of the express company from liability is valid, the bonds are non-negotiable, because they are in effect, if not in explicit terms, made payable out of a particular fund, so that the promise to pay is not unconditional. The clause under discussion is the only substantial thing that differentiates these bonds from the ordinary corporate bonds which are issued and held by the millions and are recognized and classed as negotiable instruments. The maker of the bonds is an association having a business name, which it used in making them, having shares of capital stock, indefinite succession, and a number of other characteristics which the lay public associates exclusively with corporations. These considerations lend great force to the suggestion that as a matter of public policy the exemption clause referred to should be treated as nugatory, so that the bonds may be invested with that element of negotiability which may fairly be regarded as one of the principal items of their value, and one of the most important inducements to their current sale and purchase. I deem it unnecessary to go

quite so far as that in the case at bar, since I am convinced that the exemption clause is so repugnant to the terms, tenor and purpose of the bonds that it not only may but must be taken out of the instruments in order to preserve their negotiability, and even their validity. It would be rather difficult to explain upon what theory the obligation of these bonds could be enforced in an action at law if the exemption clause is retained as part of the bonds. The maker cannot be sued in its business name, and the officers which represent it can only be sued upon obligations for which an action could be maintained against all the shareholders. (Code Civ. Pro. sec. 1919.) We are presented, in short, with the legal paradox that a written obligation, obviously intended to be negotiable, cannot be enforced in a court of law. This is an anomalous condition so utterly at variance with the manifest purpose of the association in issuing these bonds, and so palpably destructive of the legal rights of the holders thereof, that we could hardly give the exemption clause the effect which its language imports without destroying the validity of the bonds themselves.

Since both the negotiability and the validity of the bonds may be secured by the abrogation of the exemption clause, and since there is nothing in the other terms of the instruments to prevent this manifestly just disposition of the case, I conclude this branch of the discussion with the recommendation that the exemption clause be held void, and that the bonds and coupons be held negotiable. Upon the other questions I agree with the majority.

Holding these views, I think there should be an affirmance of the order of the Appellate Division, and that judgment absolute should be rendered against the appellant, with costs, in accordance with his stipulation.

GRAY and HAIGHT, JJ., concur with HISCOCK, J.; O'BRIEN J., concurs with HISCOCK, J., in opinion; CULLEN, Ch. J., concurs in result in memorandum; EDWARD T. BARTLETT and WERNER, JJ., read opinions concurring in result.

Ordered accordingly.